# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEREK WADE CARLON, | Case No. 1:18-cv-01085-SKO |
| Plaintiff, | |
| v. | ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| ANDREW SAUL, Commissioner of Social Security, | |
| Defendant. | ORDER DENYING AS MOOT PLAINTIFF'S MOTION TO ADMIT NEW EVIDENCE |
| | (Docs. 1, 21) |

_____/

## I.      INTRODUCTION

On August 13, 2018, Plaintiff Derek Wade Carlon ("Plaintiff"), proceeding pro se, filed a complaint under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

///

_____

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 6, 7.)

## II.     FACTUAL BACKGROUND

On August 28, 2013, Plaintiff protectively filed an application for DIB payments, alleging he became disabled on June 15, 2013 due to back problems, including "herniated discs 14 to s1," "c4-c6 ddd with reverse lordosis," L6 (extra lumbar vertebrae) spina bifida occulta, C3-7 degenerative disc disease/foraminal encroachment, cervical reverse lordosis, L4-5 herniated disc, and L5-S1 (L6) herniated disc.  (Administrative Record ("AR") 18, 20–21, 99, 109, 170–76, 198.) Plaintiff was born on May 10, 1972 and was 41 years old as of the alleged onset date.  (AR 26, 99, 109, 170, 198.)  Plaintiff has a college degree in theater and has past work experience as a mail carrier, salesperson, tank truck driver, stock clerk, heavy truck driver, and truck driver helper, and last worked full-time in 2009.  (AR 26, 40–41, 117, 204.)

### A.     Relevant Medical Evidence[2]

#### 1.     Precision Health Imaging

On August 7, 2009, Plaintiff underwent magnetic resonance imaging (MRI), which showed that Plaintiff had degenerative disc disease without evidence of herniated discs, and foraminal encroachment and narrowing in his lower back.  (AR 373.)  On October 23, 2010, Plaintiff underwent an MRI on his lumbar spine, which revealed a minimal degree of disc bulge at L1-L4. (AR 416–17.)  On June 25, 2011, an MRI on Plaintiff's cervical spine showed that Plaintiff's disc desiccation and disc height loss at C5-6 had increased since the August 2009 MRI, but were unchanged at the C3-4 and C5-6 levels.  (AR 374.)  On October 3, 2011, a cervical spine myelography showed Plaintiff had degenerative disc disease, mild retrolisthesis, and an extradural bulge, and a separate CT scan showed Plaintiff's most significantly affected level was at C5-6.  (AR 382–84.)

---

[2] Much of the medical evidence in the record either predates Plaintiff's alleged onset date of disability or postdates Plaintiff's date last insured.  This does not necessarily render the evidence irrelevant.  *See Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008); *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988); *Waters v. Gardner*, 452 F.2d 855, 858 (9th Cir. 1971).  Thus, the Court will consider and discuss all medical evidence in the record in its proper context.

Plaintiff's next MRI was on July 13, 2013, which showed Plaintiff had a protrusion at L5-S1. (AR 375–76.) An MRI on January 10, 2014 showed central disc protrusions at L5-S1 and possible infected fluid collection. (AR 381–82.) On March 3, 2014, an MRI on Plaintiff's back showed "[m]ild reversal of the normal cervical lordosis," "mild uncovertebral joint degeneration," and small disc protrusions at C5-6 and C6-7. (AR 378.)

### 2. Dr. Gabriel Garcia-Diaz, M.D.

On June 20, 2013, Plaintiff established care with orthopedic surgeon Dr. Gabriel Garcia-Diaz, M.D., at Ortho Spine Advance Health Inc. in Merced, California. (AR 326–71.) At his initial appointment with Dr. Garcia-Diaz, Plaintiff reported he had pain in his upper posterior neck, upper extremities, and both sides of his lower back. (AR 327.) Plaintiff reported his back problems began 27 years earlier and had worsened since Spring 2009. (AR 327.) On examination, Dr. Garcia-Diaz noted that Plaintiff's cervical spine and thoracic spine were "unremarkable with normal inspection, normal alignment, full pain-free range of motion, no muscle spasms, no tenderness . . . and no other significant findings[.]" (AR 330–31.) Dr. Garcia-Diaz noted that a lumbosacral spine x-ray showed a congenital abnormality in the sixth lumbar vertebrae and diagnosed Plaintiff with spina bifida occulta. (AR 332.) Dr. Garcia-Diaz recommended home exercise and provided free samples of muscle relaxants. (AR 332.)

Plaintiff next saw Dr. Garcia-Diaz for an evaluation on July 18, 2013. (AR 336–43.) Dr. Garcia-Diaz observed that Plaintiff's pain was generally unchanged, but review of an MRI taken earlier in July 2013 showed Plaintiff had more conditions affecting his back. (*See* AR 336–37, 340–42.) Dr. Garcia-Diaz diagnosed Plaintiff with spina bifida occulta; idiopathic low back pain; herniated nucleus pulposus; L4-5 herniation; degenerative disc disease; central spinal stenosis; lateral recess spinal stenosis; and radiculitis. (AR 342.) Dr. Garcia-Diaz recommended epidural corticosteroid injections at L4-5 and prescribed a muscle relaxant. (AR 342.)

On August 23, 2013, Plaintiff returned to Dr. Garcia-Diaz for a follow-up appointment. (AR 344–52.) Dr. Garcia-Diaz noted that Plaintiff's pain and physical condition were generally unchanged, he had normal gait, normal heel and toe walking, no evident pain, and normal general strength. (AR 344–48.) Dr. Garcia-Diaz recommended home exercise, ice packs, "patient directed self care," and lumbar spine surgery. (AR 350.) Dr. Garcia-Diaz noted that Plaintiff had considered all available treatment options and indicated he wanted to proceed with the lumbar spine surgery as recommended. (AR 350–51.)

Dr. Garcia-Diaz saw Plaintiff for a pre-operative visit on September 16, 2013 and performed a laminectomy and decompression surgery on September 18, 2013. (AR 353–60, 369–71.) The surgery was successful, and Dr. Garcia-Diaz saw Plaintiff for a post-operative evaluation on October 1, 2013. (*See* AR 370–71, 361–68.) Dr. Garcia-Diaz noted that "[t]he previously described symptoms have gotten much better since the last office visit" except for some numbness in the left leg. (AR 361.) Plaintiff's post-operative status was described as "excellent" and Dr. Garcia-Diaz noted that the surgery provided "a great deal of relief of current symptoms." (AR 361–62.) Dr. Garcia-Diaz recommended home exercise and patient-directed self-care. (AR 367.)

Dr. Garcia-Diaz's treatment notes from September 16, 2013 indicate that Plaintiff was scheduled for a follow-up appointment four weeks later, but no treatment notes from that appointment or other appointments with Dr. Garcia-Diaz are included in the record. (*See* AR 367.) The record similarly does not contain medical opinion evidence from Dr. Garcia-Diaz.

**3.    Dr. Diana J. Hylton, M.D.**

On February 4, 2014, Plaintiff first saw neurologist Dr. Diana Hylton, M.D. (AR 387–88.) Dr. Hylton diagnosed Plaintiff with severe left L5-S1 radiculopathy and noted that Plaintiff had "a moderate right L5 denervation pattern." (AR 387–88.) On March 19, 2014, Dr. Hylton performed motor nerve conduction and sensory nerve conduction studies on Plaintiff, and concluded that Plaintiff exhibited "MILD R CTS," "DELAY IN THE L MEDIAN AND ULNAR SENSORY AT

THE WRIST," and "L ULNAR COMPRESSION AT THE ELBOW." (AR 389–90.) Plaintiff returned to Dr. Hylton on July 15, 2016, and she prescribed Lyrica for shoulder pain. (AR 488.)

### 4.     Stanford Neurology Clinic

In June 2014, Plaintiff established care with the General Neurology Clinic at Stanford Healthcare. (*See* AR 434–49.) On June 5, 2014, neurosurgeon Dr. Jongsoo Park, M.D., noted that Plaintiff reported that after the September 2013 surgery, pain and numbness in his left leg increased and he did not experience any relief from his pre-operative symptoms. (AR 438.) Dr. Park determined that Plaintiff suffered from "discogenic back pain" and recommended conservative therapy in the form of physical therapy and use of an inversion table. (AR 440.)

On July 29, 2014, fellow Dr. Brian Shaller, M.D. and neurologist Dr. Steven McIntire, M.D., saw Plaintiff for a follow-up visit. (AR 441–46.) Plaintiff reported a history of left lower extremity numbness and weakness beginning in 2013. (AR 441.) Plaintiff reported that his functional status and low back pain had improved significantly, but he had a sudden onset of numbness in early 2014, which resolved in about 30 minutes. (AR 441, 444.) Dr. Shaller noted Plaintiff had normal strength, muscle tone, and bulk, intact coordination, normal gait, and intact sensation. (AR 441.) Dr. McIntire noted that Plaintiff had no abnormalities on neurological examination other than residual effects of his September 2013 surgery. (AR 446.)

### 5.     Dr. Mario Sablan, D.O.

In early 2014, Plaintiff established care with orthopedic surgeon Dr. Mario Sablan, D.O., for treatment for his elbow and shoulder issues. (*See* AR 452–82.) On April 17, 2014, Dr. Sablan saw Plaintiff for an evaluation and examination of his left elbow and left wrist. (AR 476–78.) Dr. Sablan noted that Plaintiff reported his elbow symptoms began in 2009, his discomfort had not decreased over the years, and he was in "severe" pain. (AR 476.) Dr. Sablan noted that Plaintiff's complaints were "essentially identical for both elbows" but the left elbow was reported to be more symptomatic. (AR 476.) On August 6, 2014, Dr. Sablan saw Plaintiff for a pre-operative examination and noted

that Plaintiff had agreed to undergo left elbow surgery. (AR 472–75.) Dr. Sablan diagnosed Plaintiff with cubital tunnel syndrome in his left elbow. (AR 474.) On August 8, 2014, Dr. Sablan performed surgery on Plaintiff's left elbow to treat his cubital tunnel syndrome. (AR 481–82.)

On August 21, 2014, and September 22, 2014, Dr. Sablan saw Plaintiff for post-operative visits. (AR 467–71.) Dr. Sablan noted there was "definite improvement since surgery when compared to the pre-op symptoms" and "[o]verall, there has been significant improvement." (AR 467, 470.) Dr. Sablan noted that a left arm evaluation was "basically unremarkable" with sensory and motor function "grossly intact" and "grossly normal." (AR 468, 471.)

On July 16, 2015, Plaintiff returned to Dr. Sablan with left shoulder issues. (AR 463–66.) Dr. Sablan noted that Plaintiff had moderate pain in his left shoulder and Plaintiff had "recently noticed the problem worsening." (AR 463.) Dr. Sablan noted that Plaintiff desired surgery on his left shoulder. (AR 466.) Dr. Sablan scheduled Plaintiff for a pre-operative visit on September 2, 2015. (AR 459–62.) Dr. Sablan performed left shoulder surgery on Plaintiff on September 4, 2015, and saw Plaintiff for a post-operative visit on September 17, 2015. (AR 455–58.) Dr. Sablan noted that Plaintiff felt the progress since surgery was "satisfactory," and recommended self-directed rehabilitation. (AR 455, 457.)

On October 19, 2015, Plaintiff returned to Dr. Sablan with right shoulder pain. (AR 452–54.) Dr. Sablan diagnosed Plaintiff with rotator cuff tendonitis and impingement syndrome in his left shoulder/arm and labral tear and impingement syndrome in his right shoulder/arm, and recommended surgery on the right shoulder. (AR 453–54.)

### 6. State Agency Physicians

On November 15, 2013, P. Frye, M.D., a Disability Determinations Service medical consultant, assessed the severity of Plaintiff's impairments and projected that Plaintiff would be able to perform medium work within 12 months after his alleged onset date. (AR 103–04.) Dr. Frye opined Plaintiff could lift or carry 50 pounds occasionally and 25 pounds frequently; stand or walk

for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and had unlimited pushing/pulling ability. (AR 104.) In assessing Plaintiff's residual functional capacity (RFC),[3] Dr. Frye opined that Plaintiff could climb ramps/stairs and ladders/ropes/scaffolds and kneel, crouch and crawl frequently; and stoop occasionally. (AR 105.)

Upon reconsideration, on September 20, 2014, another Disability Determinations Service medical consultant, R. Mitgang, M.D., discussed the medical evidence and Plaintiff's disabling conditions and stated that "the projected RFC dated 11/15/2013 cannot be affirmed, and it appears that [Plaintiff] may actually be able to meet [Listing] 1.04, depending on current evaluations." (AR 114.) Dr. Mitgang also requested that more recent evaluations, including treatment notes from a June 5, 2014 appointment at Stanford Healthcare, be made part of the record. (AR 114.)

On October 6, 2014, a third Disability Determinations Service medical consultant, Charles Fina, M.D. assessed Plaintiff's current RFC (as opposed to Dr. Frye's assessment of Plaintiff's projected RFC). (AR 109–19.) Dr. Fina found Plaintiff could currently perform light work; lift or carry 20 pounds occasionally and 10 pounds frequently; stand or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and had unlimited pushing/pulling ability. (AR 116–18.) Dr. Fina opined that Plaintiff could climb ramps/stairs frequently; climb ladders/ropes/scaffolds occasionally; balance frequently; stoop and kneel occasionally; and crouch and crawl frequently. (AR 117–18.)

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996). The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

## B. Administrative Proceedings

The Commissioner denied Plaintiff's application for benefits initially on November 26, 2013, and again on reconsideration on October 17, 2014. (AR 121–24, 128–32.) On October 24, 2014, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 126.)

On August 2, 2016, Plaintiff appeared without counsel and testified before an ALJ as to his alleged disabling conditions. (AR 34–98.) The ALJ advised Plaintiff of his right to be represented by counsel at the hearing, and Plaintiff responded that he understood and wanted to proceed without counsel. (AR 36.) Plaintiff testified that he could drive, shower, and dress without assistance, and did household chores daily at his own pace. (AR 41.) Plaintiff stated that in a typical day, he would eat breakfast, see his wife off to work, read the newspaper online, and take his dog for a walk. (AR 43.) Plaintiff testified he has held multiple jobs in the past 15 years, including jobs as a pet store manager, locksmith trainee, a position driving a small box truck, delivery driver, dock manager, associate at Home Depot, and a mail carrier. (AR 46–51.)

As to his disabling conditions, Plaintiff testified he had issues with his neck, shoulders, back, elbows, and legs. (*See* AR 53.) Plaintiff testified he has experienced back pain since he was in junior high school and it "comes and goes" depending on what he is doing. (AR 53.) Plaintiff stated when his back pain comes on, it starts at his lower back and moves down to both his legs and feet. (AR 54.) Since his surgery in September 2013, the pain that comes on causes Plaintiff's left leg to go numb from the knee down. (AR 54.) Plaintiff stated his back pain could occur at any time, and when his back pain starts, he would sometimes lay flat on the floor. (AR 57.) Plaintiff testified that because of the September 2013 surgery that caused left leg numbness, he now had severely damaged nerves in his left lower leg. (AR 54–55.) Plaintiff stated he had been prescribed Lyrica and Tramadol previously, but he now only took aspirin to help with his pain. (AR 60–62.) Plaintiff testified that his biggest current health problems involve his left shoulder and elbow. (AR 62–68.) Plaintiff testified he had left elbow surgery in February 2015 and left

shoulder surgery in September 2015.  (AR 64.)  He stated he has experienced severe left shoulder pain since 2009.  (AR 62.)

Plaintiff testified he experiences stabbing pain in his toes, feet and legs, and is unable to use his right leg at all sometimes.  (AR 68–69.)  He experiences stabbing pain in his left leg as well.  (AR 69.)  Plaintiff stated he could lift about five to ten pounds, could generally stand if he had something to lean against, could wash dishes and bend over to pick things up, climb stairs slowly, and perform other activities.  (AR 75–79.)  Plaintiff also testified it was painful to sit at times.  (AR 86.)

A Vocational Expert ("VE") testified at the hearing that Plaintiff had past work as a mail carrier, Dictionary of Occupational Titles (DOT) code 230.367-010, which was medium work with a specific vocational preparation (SVP)[4] of 4; a building materials sales attendant, DOT code 299.677-014, which was heavy work with a SVP of 3; a retail stock clerk, DOT code 299.367-014, which was heavy work with a SVP of 4; a tank truck driver, DOT code 903.683-018, which was medium work with a SVP of 3; a heavy truck driver, DOT code 905.663-014, which was medium work with a SVP of 4; and a truck driver helper, DOT code 905.687-010, which was heavy work with a SVP of 2.  (AR 88–90.)  The ALJ asked the VE to consider a person of Plaintiff's age, education, and with his work background.  (AR 90.)  The VE was also to assume this person could lift and carry 20 pounds occasionally and 10 pounds frequently; could sit, stand, or walk 6–8 hours in an 8-hour work day; occasionally climb ladders, ropes, or scaffolds, stoop, and kneel; frequently crouch, crawl, climb, reach overhead with the right upper extremity and finger and handle with the right upper extremity.  (AR 90–91.)  The VE testified that such a person could not perform Plaintiff's

---

[4] Specific vocational preparation (SVP), as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id*.

past relevant work. (AR 91.) The VE testified such a person could perform other jobs in the national economy, however, including: cashier II, DOT code 211.462-010, which is light work with a SVP of 2 with approximately 835,000 jobs available in the national economy; sales attendant, DOT code 299.677-010, which is light work with a SVP of 2 with approximately 217,000 jobs available; and fast food worker, DOT code 311.472-010, which is light work with a SVP of 2 with approximately 1,258,000 jobs available. (AR 91.)

In a second hypothetical, the ALJ asked the VE to consider an individual with the limitations described in the first hypothetical except that the person could sit or stand but would need to change position about hourly. (AR 91.) The VE testified that such a person could not perform Plaintiff's past relevant work. (AR 91.) The VE testified such a person could perform other jobs in the national economy, however, including: cashier II, DOT code 211.462-010, which is light work with a SVP of 2, but with only 83,500 jobs available in the national economy considering the limitations imposed in the second hypothetical; housekeeping cleaner, DOT code 323.687-014, which is light work with a SVP of 2 with approximately 135,000 jobs available; and outside deliverer, DOT code 230.663-010, which is light work with a SVP of 2 with approximately 27,000 jobs available. (AR 91–92.)

In a third hypothetical, the ALJ asked the VE to consider an individual that could lift and carry 10 pounds occasionally and 10 pounds frequently; sit 6 hours in an 8-hour work day; stand and walk 2 hours in an 8-hour workday; occasionally stoop, crouch, crawl, climb, kneel, and balance; never climb ladders, ropes, or scaffolds; and perform occasional overhead reaching bilaterally and frequent right upper extremity finger gripping and grasping. (AR 92.) The VE testified that such an individual would be able to perform all unskilled sedentary work. (AR 93.)

In a fourth hypothetical, the ALJ asked the VE to consider an individual with the limitations described in the third hypothetical but who also needed to take an additional 2–4 breaks of 30 minutes each per day or miss at least four days per month. (AR 93.) The VE testified that such an

individual would not be able to perform any work at all. (AR 93.)

**C.    The ALJ's Decision**

In a decision dated November 29, 2016, the ALJ found that Plaintiff was not disabled, as defined by the Act. (AR 18–27.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 404.1520. (AR 20–27.) The ALJ decided that Plaintiff had not engaged in substantial gainful activity from June 15, 2013, the alleged onset date, through December 31, 2013, the date last insured (step one). (AR 20.) At step two, the ALJ found that Plaintiff had the following severe impairments: "spina bifida occulta"; "lumbar degenerative disc disease status post laminectomy and discectomy at L4-5"; and "cervical degenerative disc disease." (AR 20.) The ALJ found that Plaintiff also had the following severe impairments that were diagnosed after the date last insured: "right shoulder internal derangement"; "left shoulder tendonopathy status post arthroscopic surgery"; "left elbow cubital tunnel syndrome status post release"; and "right elbow cubital tunnel syndrome." (AR 20.) The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the Listings (step three). (AR 20–21.)

The ALJ assessed Plaintiff's RFC and applied the RFC assessment at steps four and five. *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ determined that Plaintiff retained the RFC:

> to perform light work as defined in 20 CFR 404.1567(b) except he could lift and
> carry 20 pounds occasionally and 10 pounds frequently, stand and walk six to eight
> hours and sit six to eight hours in an eight-hour workday, occasionally climb ladders,
> ropes, and scaffolds, stoop, and kneel; frequently crouch, crawl, and climb ramps and
> stairs; and frequently reach overhead, finger, and handle with the right upper
> extremity. In addition, he needed to be able to change positions hourly from sitting
> or standing.

(AR 21.) Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" she rejected Plaintiff's subjective testimony as "not entirely

consistent with the medical evidence and other evidence in the record[.]" (AR 22.) Specifically, the ALJ found that Plaintiff's "testimony appear[ed] to reflect his current level of functioning, rather than his functional abilities and limitations prior to his date last insured." (AR 22.) At step five, the ALJ found that Plaintiff could not perform any past relevant work but that jobs existed in significant numbers in the national economy that Plaintiff could perform. (AR 25–27.)

Plaintiff sought review of the ALJ's decision before the Appeals Council, which denied review on June 25, 2018. (AR 1–6.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981.

### III. LEGAL STANDARD

**A. Applicable Law**

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The Ninth Circuit has provided the following description of the sequential evaluation analysis:

In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments.

If not, the claimant is not disabled.  If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1.  If so, the claimant is automatically presumed disabled.  If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy.  If so, the claimant is not disabled.  If not, the claimant is disabled.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps."  *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis."  *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)).  "However, if a claimant establishes an inability to continue her past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work."  *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.     Scope of Review**

"This court may set aside the Commissioner's denial of disability insurance benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Tackett*, 180 F.3d at 1097 (citation omitted).  "Substantial evidence is defined as being more than a mere scintilla, but less than a preponderance."  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098).  "Put another way, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"This is a highly deferential standard of review …"  *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  "The ALJ's findings will be upheld if supported by

inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund*, 253 F.3d at 1156 (citations omitted) ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner.").

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV.    DISCUSSION

Plaintiff raises four discernable claims of error:[5] (1) the Commissioner's denial of access to a paper copy of Plaintiff's records until December 2018 violated Plaintiff's Fifth Amendment due process rights; (2) the ALJ erred by failing to fully and fairly develop the record; (3) the Appeals

---

[5] The Ninth Circuit has directed that courts are to liberally construe the "'inartful pleading' of pro se litigants." *Eldridge v. Block*, 832 F.2d 1132, 1137 (9th Cir. 1987). Thus, the Court liberally construes the contentions in Plaintiff's opening brief and reply brief to raise four distinct claims. Plaintiff filed a 24-page reply brief in which he makes numerous contentions, some of which are not obviously connected to any of the four claims he raises with sufficient clarity. (*See generally* Doc. 22.) Plaintiff has waived any claim not specifically raised in the opening brief and reply brief. *See Bennett v. Colvin*, 609 F. App'x 522, 524 (9th Cir. 2015).

Council erred by refusing to consider additional evidence submitted after the hearing; and (4) the ALJ erred by not finding that Plaintiff's "severe left L5-S1 radiculopathy" was a severe impairment. (*See* Doc. 15 at 6–11; Doc. 22 at 12.)  The Commissioner responds that Plaintiff has not shown that the ALJ's decision was unsupported by substantial evidence, and Plaintiff's constitutional argument and arguments regarding evidence in the record lack merit.  (Doc. 16 at 9–14.)

For the reasons stated below, the Court finds that the Commissioner did not violate Plaintiff's constitutional rights, but agrees with Plaintiff's position that the ALJ failed to fully and fairly develop the record, and will remand the case to the Commissioner for further administrative proceedings.  As the case will be remanded on that basis, the Court does not reach Plaintiff's other claims of administrative error.

**A.  The Commissioner Did Not Violate Plaintiff's Fifth Amendment[6] Procedural Due Process Rights by Failing to Provide Plaintiff with Paper Copies of His Records**

**1.  Legal Standards**

"The Social Security Act grants to district courts jurisdiction to review only 'final decisions' of the Commissioner."  *Klemm v. Astrue*, 543 F.3d 1139, 1144 (9th Cir. 2008) (citing 42 U.S.C. § 405(g)); *see also Udd v. Massanari*, 245 F.3d 1096, 1098–99 (9th Cir. 2001) (citing *Califano v. Sanders*, 430 U.S. 99, 107 (1977)); *Evans v. Chater*, 110 F.3d 1480, 1482 (9th Cir. 1997).  However, a discretionary decision by the Commissioner that is not a final decision may be subject to an exception where the Commissioner's decision "is challenged on constitutional grounds."  *Evans*, 110 F.3d at 1482 (citing *Sanders*, 430 U.S. at 109); 42 U.S.C. § 405(g).  This "exception applies to any colorable constitutional claim of due process violation that implicates a due process right either

---

[6] Plaintiff cites both the Fifth Amendment and the Fourteenth Amendment in the complaint.  (Doc. 1 at 4.)  The Court construes Plaintiff's claim as brought under the Fifth Amendment only, because the Fourteenth Amendment does not apply to federal actors.  *See Bolling v. Sharpe*, 347 U.S. 497, 498 (1954); *U.S. v. Navarro*, 800 F.3d 1104, 1112 n.6 (9th Cir. 2015).

to a meaningful opportunity to be heard or to seek reconsideration of an adverse benefits determination." *Udd*, 245 F.3d at 1099 (internal quotation marks and citation omitted).

A colorable constitutional claim is one that is "not 'wholly insubstantial, immaterial, or frivolous.'" *Klemm*, 543 F.3d at 1144 (quoting *Udd*, 245 F.3d at 1099); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("Dismissal for lack of subject matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible . . . or otherwise completely devoid of merit as not to involve a federal controversy.'") (citation omitted). "A 'mere allegation of a due process violation' is not a colorable constitutional claim," *Klemm*, 543 F.3d at 1144 (quoting *Anderson v. Babbitt*, 230 F.3d 1158, 1163 (9th Cir. 2000)), "[r]ather, the claim must be supported by 'facts sufficient to state a violation of substantive or procedural due process.'" *Id.* (quoting *Hoye v. Sullivan*, 985 F.2d 990, 991–92 (9th Cir. 1992)).

The Due Process Clause of the Fifth Amendment provides that no person "shall be deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V. "A threshold requirement to a substantive or procedural due process claim is [a] plaintiff's showing of a liberty or property interest protected by the Constitution." *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994).

"Due Process is flexible and calls for procedural protections as the particular situation demands." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). It is not "a technical conception with a fixed content unrelated to time, place, and circumstances." *Id.* (quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886 (1961)). Moreover, not every case requires a formal hearing or an opportunity to cross-examine witnesses to satisfy due process.

If a claimant alleges a colorable procedural due process claim over which the district court may exercise jurisdiction, the court must consider the factors set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine what process is required. *See Udd*, 245 F.3d at 1099 ("It is axiomatic that due process requires that a claimant receive meaningful notice and an opportunity to be heard

before his claim for disability benefits may be denied.") (citing *Mathews*, 424 U.S. at 333).

### 2. Analysis

#### a. Contentions of the Parties

Plaintiff alleges that the Commissioner violated his due process rights by failing to give him reasonable access to his records during the administrative process. (*See* Doc. 15 at 6–9.) Plaintiff claims that the lack of access to his records caused him to be unprepared at the hearing before the ALJ and prevented him from effectively challenging the ALJ's decision before the Appeals Council and before this Court. (Doc. 15 at 7; Doc. 22 at 2.) Plaintiff admits that the Commissioner gave him access to his records from the beginning of the process, but asserts that the forms of access provided were inadequate. (*See* Doc. 15 at 7–8.) Specifically, Plaintiff states that the Commissioner provided his records in an encrypted disk, and also allowed him to view his records by using the public access computers at the Office of Disability Adjudication and Review (ODAR)[7] in Fresno, California. (*See id.* at 7.) The Commissioner allegedly refused to provide a paper copy of the records to Plaintiff during the administrative process.[8] (*Id.*)

Plaintiff contends it was impracticable to use the forms of access provided because he does not own a CD-ROM drive (which would facilitate use of the encrypted disk) and the local library refused access to its CD-ROM drives, and the computers at the ODAR facility were not always available, attorneys were given preference for using the computers, and Plaintiff is a slow reader. (*Id.* at 8–9.) Thus, Plaintiff claims the Commissioner violated his Fifth Amendment due process rights by failing to provide him with a paper copy of his records. (*See id.* at 7–9.)

The Commissioner responds briefly that Plaintiff's allegations do not establish a due process violation and he has not provided any legal authority to support his allegations. (Doc. 16 at 11.)

---

[7] The ODAR is the division of the Social Security Administration tasked with scheduling and managing disability hearings for Social Security applicants appealing denials of disability claims.

[8] Plaintiff states he first received a hardcopy of the administrative record in December 2018, when the Commissioner filed and served it as part of this action. (Doc. 22 at 3; *see also* Doc. 11.)

The Commissioner also contends the issue is moot because Plaintiff received a paper copy of the administrative record in December 2018. (*Id.* at 12.) The Commissioner does not contend that Plaintiff has failed to raise a colorable constitutional claim such that the Court does not have jurisdiction to decide it, but only that the claim is ultimately incorrect on its merits. (*See id.* at 11–12.)

### b. Plaintiff States a Colorable, but Ultimately Unmeritorious, Constitutional Claim

The Court finds that Plaintiff's constitutional claim is reviewable but, ultimately, meritless. Plaintiff's claim is the type of constitutional claim that is reviewable in the Social Security Act context—i.e., a procedural claim that is collateral to the underlying substantive claim that the claimant is entitled to disability benefits. *See Boettcher v. Secretary of Health and Human Services*, 759 F.2d 719, 721 (9th Cir. 1985). Also, Plaintiff's claim is not "so insubstantial, implausible . . . or otherwise completely devoid of merit as not to involve a federal controversy" and thus it is a colorable claim over which the Court may exercise jurisdiction,[9] and the Court will proceed to consider the merits of Plaintiff's claim. *See Steel Co.*, 523 U.S. at 89.

To determine what process is due, the Court must look at the *Mathews* factors, including: (1) the private interest at stake; (2) the risk of erroneously depriving the petitioner of that interest under the procedures currently in use, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the burdens of adding or substituting the procedures used. *Mathews*, 424 U.S. 319, 335 (1976).

Based on the *Mathews* factors, the Court finds that Plaintiff has been afforded all the procedural protections to which he was entitled. The private interest at stake in this case, Plaintiff's

---

[9] Plaintiff alleges specific facts to support a procedural due process claim—including that he was denied reasonable access to his records and that this alleged denial harmed his ability to participate in the administrative process—thus, Plaintiff's claim is more than a bare "allegation of a due process violation." *See Klemm*, 543 F.3d at 1144; (Doc. 15 at 7–9.) Further, the Commissioner does not contend that Plaintiff failed to allege a colorable constitutional claim, but only that Plaintiff's due process claim ultimately lacks merit. Thus, the Court will review the claim on its merits.

claim to disability benefits, is significant. Further, the Commissioner does not contend that the administrative burden of providing Plaintiff with a paper copy of his administrative record would be significant, which suggests that the burden is relatively slight.

The Court finds that the risk of erroneous deprivation of benefits without providing Plaintiff access to his records in his preferred format (paper), is low and outweighs the other *Mathews* factors. *See Dhillon v. Mayorkas*, 537 F. App'x 737, 738 (9th Cir. 2013) (finding "the second *Mathews* factor [was] dispositive of [the plaintiffs'] due process claim" where there was very little risk of erroneous deprivation through the procedures used). As an initial matter, disability benefits cases present a unique situation as the private and governmental interests at stake are somewhat aligned, in that both the claimant and the Commissioner have an interest in avoiding the erroneous deprivation of benefits. *See Boettcher*, 759 F.2d at 722 ("One of the government's interests, an interest it shares with the claimant, is to avoid an erroneous deprivation of benefits."). This non-adversarial nature of the process lowers the risk of erroneous deprivation. *See Sims v. Apfel*, 530 U.S. 103, 111 (2000) ("Social Security proceedings are inquisitorial rather than adversarial."). This is especially true here because Plaintiff was actually given access to his records in multiple forms. Significantly, although Plaintiff asserts the encrypted disk format was unusable, the record reflects that the Commissioner sent Plaintiff a copy of his records on December 1, 2015, and included detailed instructions on how to open the encrypted disk. (AR 260–61.) That Plaintiff would have preferred the records in a different or more convenient format does not establish a due process violation.

Further, Plaintiff did not assert at the hearing that he was unprepared or unable to plead his case because he was not given his records in paper format and only had access to the records in electronic format. Indeed, Plaintiff participated in his hearing, discussed much of the medical evidence with the ALJ, and on multiple occasions referenced specific medical records he either had in front of him or had sent to the Commissioner. (*See generally* AR 34–98.) After the hearing,

Plaintiff sent more medical records to the Commissioner, requested review from the Appeals Council, and then filed this action. The procedures provided by the Commissioner afforded Plaintiff a meaningful opportunity to be heard. *See Boettcher*, 759 F.2d at 723 ("The essence of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."). Thus, Plaintiff's due process claim fails.

**B.      The ALJ Failed to Fully and Fairly Develop the Record**

**1.      Legal Standard**

"The ALJ always has a 'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered . . . even when the claimant is represented by counsel.'" *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) (citing *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)). When, as here, the claimant is unrepresented, "the ALJ must be especially diligent in exploring for all the relevant facts." *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001); *see also Celaya*, 332 F.3d at 1183 (when a claimant is not represented by counsel, the duty to develop the record is "heightened"); *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1992) ("[T]he ALJ is not a mere umpire at such a proceeding, but has an independent duty to fully develop the record, especially where the claimant is not represented: . . . it is incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts. He must be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited.").

It is well established that a claimant bears the burden of providing medical and other evidence that supports the existence of a medically determinable impairment. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998) ("At all times, the burden is on the claimant to establish her entitlement to disability insurance benefits."). Indeed, it is "not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so." *Bowen*, 482 U.S. at 146 n.5.

Nevertheless, as the Ninth Circuit has explained:

> The ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered. This duty extends to the represented as well as to the unrepresented claimant. When the claimant is unrepresented, however, the ALJ must be especially diligent in exploring for all the relevant facts . . . Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry.

*Tonapetyan*, 242 F.3d at 1150 (citations and quotation marks omitted). In short, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001) (citing *Tonapetyan*, 242 F.3d at 1150).

"The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." *Tonapetyan*, 242 F.3d at 1150. However, "as some courts have persuasively observed, the ALJ 'does not have to exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning. The standard is one of reasonable good judgment.'" *Stevenson v. Colvin*, No. 2:15-cv-0463-CKD, 2015 WL 6502198, at *3 (E.D. Cal. Oct. 27, 2015) (quoting *Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997)).

**2.    Analysis**

The Court finds that the ALJ's duty to develop the record was triggered, and the ALJ failed to fulfill her heightened duty to develop the record when Plaintiff was unrepresented at the hearing. The ALJ's duty to develop the record is triggered if there is ambiguous evidence or the record is inadequate to allow for proper analysis of the evidence. *See Tonapetyan*, 242 F.3d at 1150. Both triggering events are present in this case. First, the ALJ made specific findings at the hearing that the record was inadequate. (*See, e.g.,* AR 66 ("Mario. Okay. And was he out of a specific clinic?

I'm going to have my clerk get those records"), AR 67 ("I picked up the name, but I didn't have any of those records so I want to get those"), AR 69 ("[W]e'll get those updated records for the shoulder and elbow because I don't know anything about that").) Plaintiff also referenced records that were missing that he wanted the ALJ to review—including, for example, a letter from Dr. Park at Stanford Healthcare to the Commissioner about Plaintiff's alleged disability. (*See* AR 72–73.) The record also reflects that notes from appointments at Stanford Healthcare are missing. (*See* AR 114.) Also, aside from the ALJ's observations, the record was objectively inadequate for proper evaluation of the evidence. *See Bernice H. v. Berryhill*, No. 3:17-cv-00957-HZ, 2018 WL 3862303, at *4 (D. Or. Aug. 14, 2018) ("[T]he ALJ's duty is triggered where it is clear medical records are missing or additional medical records are referenced but not included in the administrative record."). For example, Dr. Garcia-Diaz's treatment notes reference future appointments during the relevant time period prior to the date last insured, but the record does not contain notes from those appointments. (*See* AR 367.)

Next, the record contains ambiguous medical evidence. For example, the record contains numerous references to family practice physician, James Jones, M.D., as a referral source, but contains no treatment records from Dr. Jones. (*See, e.g.,* AR 327, 336, 344, 353, 361, 377, 402, 406, 409, 410, 428); *see Ruiz v. Colvin*, No. EDCV 16-2027-KK, 2017 WL 2468781, at *5 (C.D. Cal. June 5, 2017) (ALJ failed to develop record for a represented plaintiff by not inquiring into referral doctor referenced in two pages of treatment notes). Plaintiff also listed Dr. Jones in his application for benefits as a physician that the Commissioner should obtain records from, but the Commissioner failed to do so. (*See* AR 253.) Also, Dr. Garcia-Diaz's treatment notes that referenced future appointments did not state how many future appointments there were, what the appointments would entail, or what their purpose was. Significantly, the record is devoid of any medical opinion evidence from any of Plaintiff's treating or evaluating physicians. (*See* AR 104.)

Thus, the ALJ had no medical opinion evidence on Plaintiff's RFC to compare to the opinions of the state agency physicians.

The ALJ obtained some additional records after the hearing, including Dr. Sablan's treatment notes and certain MRI results. (*See* AR 289–90, 293–94, 416–98.) However, the ALJ did not obtain any of the other missing records, including the records from Plaintiff's treating physician during the relevant period prior to the date last insured, and did not obtain any medical opinions from Plaintiff's treating or evaluating physicians.

The Court finds that in the context of this particular case, the ALJ's duty to fully and fairly develop the record included obtaining the missing medical evidence from Dr. Garcia-Diaz, Stanford Healthcare, and Dr. Jones, and obtaining opinion evidence from at least Dr. Garcia-Diaz, Plaintiff's treating physician during the relevant period prior to the date last insured. This is especially true here for a few reasons.

First, Dr. Garcia-Diaz's treatment notes do not include any work restrictions or any comment on work activity, because Plaintiff was not working at the time anyway and had not worked since 2009, so there was no reason for Dr. Garcia-Diaz to include work restrictions. (*See* AR 326–71.) "A treating physician's evidence is inadequate when it 'contains a conflict or ambiguity that must be resolved' or 'does not contain all the necessary information' to make a decision." *Carr v. Apfel*, No. C 00-02537 MMC, 2003 WL 132534, at *2 (N.D. Cal. Jan. 9, 2003). Here, because Dr. Garcia-Diaz's treatment notes did not include information related to Plaintiff's work restrictions, the ALJ had no information from Plaintiff's treating physician during the relevant time period as to Plaintiff's ability to work and any work restrictions his conditions caused. *See id.* ("At the time Dr. Phillips treated Carr, however, she had not worked for close to eight years. As a consequence, Dr. Phillips had no reason to impose any work restrictions as part of his treatment. Thus, in the absence of an inquiry by the . . . ALJ, Dr. Phillips' opinion as to the effect of Carr's back condition on her ability to work remains unknown.").

Thus, Dr. Garcia-Diaz's evidence did not contain all the necessary information to make a decision, and the ALJ should have obtained opinion evidence as to Plaintiff's RFC and work restrictions during the relevant period from Dr. Garcia-Diaz. *See id.* (ALJ failed to fully develop the record by failing to obtain opinion evidence from treating physician); *Bernice H.*, 2018 WL 3862303, at \*4–5; *Ollar v. Colvin*, No. 1:13-cv-1450-BAM, 2015 WL 1347733, at \*8–9 (E.D. Cal. Mar. 24, 2015); *see also Peed v. Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991) ("Because the expert opinions of a treating physician as to the existence of a disability are binding on the factfinder, it is not sufficient for the ALJ simply to secure raw data from the treating physician . . . It is the opinion of the treating physician that is to be sought; it is his opinion as to the existence and severity of a disability that is to be given deference.").

Finally, because Plaintiff was unrepresented, the ALJ had a heightened and heavy duty to develop the record. *See Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978); *Celaya*, 332 F.3d at 1183; *Tonapetyan*, 242 F.3d at 1150; *Bernice H.*, 2018 WL 3862303, at \*4. The Court concludes that in this case, the ALJ did not fulfill that heightened duty, and the case must be remanded for that reason.

## C. The ALJ's Error Was Not Harmless

The Court now turns to the analysis of whether this error by the ALJ was harmless. The Ninth Circuit "ha[s] long recognized that harmless error principles apply in the Social Security Act context." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006)); *see also Garcia v. Comm'r of Soc. Sec.*, 768 F.3d 925, 932 n.10 (9th Cir. 2014) (stating that the harmless error analysis applies where the ALJ errs by not discharging their duty to develop the record). As such, "the court will not reverse an ALJ's decision for harmless error." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citing *Robbins*, 466 F.3d at 885).

An error is harmless "where it is inconsequential to the ultimate nondisability determination." *Molina*, 674 F.3d at 1115 (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (stating that an error is also harmless "'if the agency's path may reasonably be discerned,' even if the agency 'explains its decision with less than ideal clarity'" (quoting *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004)). "In other words, in each case [courts] look at the record as a whole to determine whether the error alters the outcome of the case." *Molina*, 674 F.3d at 1115. "[T]he nature of [the] application" of the "harmless error analysis to social security cases" is "fact-intensive—'no presumptions operate' and '[courts] must analyze harmlessness in light of the circumstances of the case.'" *March v. Colvin*, 792 F.3d 1170, 1172 (9th Cir. 2015) (quoting *Molina*, 674 F.3d at 1121). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki*, 556 U.S. at 409 (citations omitted).

Here, the record establishes that the ALJ's error was not harmless. This is especially so because of the lack of opinion evidence as to Plaintiff's work restrictions during the relevant time period. Further, Plaintiff's treating physician's opinion, if obtained, would be entitled to controlling weight from the ALJ, which could affect the outcome of the case. *See* 20 C.F.R. § 404.1527(c)(2) ("If . . . a treating [physician's] opinion . . . is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record, [the Commissioner] will give it controlling weight"); *Reddick*, 157 F.3d at 725 ("Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for clear and convincing reasons supported by substantial evidence in the record." (citation omitted)). Thus, the Court finds the ALJ's error was not harmless.

## D. The ALJ's Error Warrants Remand for Further Proceedings

Where the ALJ commits an error and that error is not harmless, the "ordinary … rule" is "to remand to the agency for additional investigation or explanation." *Treichler*, 775 F.3d at 1099

(citations omitted).  The Ninth Circuit recognized a limited exception to this typical course where courts "remand[] for an award of benefits instead of further proceedings."  *Id.* at 1100–01 (citations omitted); *see also id.* at 1100 (noting that this exception is "sometimes referred to as the 'credit-as-true' rule").  In determining whether to apply this exception to the "ordinary remand rule," the court must determine, in part, whether (1) "the record has been fully developed;" (2) "there are outstanding issues that must be resolved before a determination of disability can be made;" and (3) "further administrative proceedings would be useful."  *Id.* at 1101 (citations omitted).  As to the last inquiry, additional "[a]dministrative proceedings are generally useful where the record has not been fully developed, there is a need to resolve conflicts and ambiguities, or the presentation of further evidence . . . may well prove enlightening in light of the passage of time."  *Id.* (citations omitted).  Ultimately, "[t]he decision whether to remand a case for additional evidence or simply to award benefits is in [the court's] discretion."  *Swenson*, 876 F.2d at 689 (citation omitted).

Here, the Court finds that the "credit-as-true" exception to the "ordinary remand rule" is inapplicable because additional administrative proceedings would be useful.  Specifically, the case must be remanded for the ALJ to develop the record, including with medical opinions from Plaintiff's treating physicians.  Further proceedings would therefore be useful to allow the ALJ to resolve this "outstanding issue[]" before a proper disability determination can be made.  *See Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1988).  On remand, the ALJ should address these issues by developing the record further as set forth above.

Accordingly, the Court will remand this case for further proceedings.

**E.     The Court Declines to Determine Plaintiff's Remaining Assertions of Error**

As the Court finds that remand is appropriate for the ALJ to further develop the record, the Court does not determine Plaintiff's additional assertions of error regarding the ALJ's step two finding and the Appeals Council's denial of Plaintiff's request for review.  (*See* Doc. 15 at 6–11; Doc. 22 at 12); *cf. Newton v. Colvin*, No. 2:13-cv-2458-GEB-EFB, 2015 WL 1136477, at *6 n.4

(E.D. Cal. Mar. 12, 2015) ("As the matter must be remanded for further consideration of the medical evidence, the court declines to address plaintiff's remaining arguments"); *Willmett ex rel. A.P. v. Astrue*, No. 2:10-cv-01201 KJN, 2011 WL 3816284, at *1 (E.D. Cal. Aug. 25, 2011) ("Because this legal error warrants remanding this matter for further proceedings, the undersigned does not reach the remainder of [the] plaintiff's arguments seeking reversal of the ALJ's and Appeals Council's decisions.").

**F.    Motion to Admit New Evidence and Other Legal Claims**

Plaintiff also filed a motion to admit new evidence[10] on May 15, 2019, which the Commissioner opposed. (Docs. 21, 23.) Because the case will be remanded to the agency for further proceedings based on the ALJ's failure to fully develop the record, the Court DENIES AS MOOT Plaintiff's motion.

Finally, in Plaintiff's complaint, he raises claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and states that he is "requesting a . . . class action" and "$1,000,000,000 in damages for ALL prior pro se disability claimants who could not reasonably access their SSA records[.]" (Doc. 1 at 4, 7–8.) These claims in Plaintiff's complaint that are beyond his challenge to the ALJ's decision are not properly asserted in this Social Security Act review under 42 U.S.C. § 405(g). *See Mitchell v. Berryhill*, No. 2:15-cv-0911-CKD, 2017 WL 387256, at *5 (E.D. Cal. Jan. 27, 2017) ("To the extent plaintiff requests that the court review other administrative actions beyond the ALJ's decision or seeks to assert other claims relating to discrimination or violations of her and her representative's due process rights, this action is not the appropriate vehicle to assert those claims.").

---

[10] The evidence attached to Plaintiff's motion that he seeks to admit for the first time in this Court consists of certain of Dr. Garcia-Diaz's treatment notes from the relevant time period. (*See* Doc. 21 at 3–73.) Because the case is being remanded to the Commissioner for further development of the record, including obtaining medical opinion evidence, Plaintiff's motion will be denied as moot and the Court takes no position as to whether the treatment notes attached to the motion, by themselves, would change the outcome of the administrative proceeding.

Accordingly, because this review under the Social Security Act is not the appropriate case in which to assert the claims, Plaintiff's claims under the ADA, Plaintiff's class action claims, and Plaintiff's request for damages, are DISMISSED WITHOUT PREJUDICE.

## CONCLUSION AND ORDER

It is HEREBY ORDERED:

1.      The Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, VACATED and the case REMANDED to the ALJ for further proceedings consistent with this Order;

2.      The Clerk is DIRECTED to enter judgment pursuant to 42 U.S.C. § 405(g) in favor of Plaintiff Derek Wade Carlon and against Defendant Andrew Saul, Commissioner of Social Security;

3.      The remaining claims in Plaintiff's complaint, (Doc. 1), are DISMISSED WITHOUT PREJUDICE; and

4.      Plaintiff's motion to admit new evidence, (Doc. 21), is DENIED AS MOOT.

IT IS SO ORDERED.

Dated:   **September 9, 2019**                     /s/ *Sheila K. Oberto*

                                         UNITED STATES MAGISTRATE JUDGE